## Case No. 2,336.

### The CAMBRIDGE v. The OMEGA.

[5 Hughes, 487.][1]

Circuit Court, D. Maryland. April Term, 1866.

COLLISION—VESSEL AT ANCHOR—FOG—SPEED—LIGHTS—LOOKOUT.

[A speed of seven or eight miles per hour, compass out of order, and insufficient lookout on the part of a steamer, and the absence of a lookout or lights on a vessel at anchor, out of the usual course of navigation, are faults requiring a division of the damages resulting from a collision between the two on a night so foggy that the best light could not be seen at a greater distance than 600 feet.]

[Appeal from the district court of the United States for the district of Maryland.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[1] [The opinion in this case is published from a copy certified by the clerk of the court from the records in his office.]

[In admiralty. Libel by the owners of the schooner Omega against the steamer Cambridge. There was a decree in the district court dividing the damage (case unreported), and the owners of the steamer appeal.]

CHASE, Circuit Justice. The schooner Omega, from Baltimore for Kent Island, on the 17th November, 1865, came to anchor, the wind being very light, on the south-west side of the Patapsco, in a part of the river out of the usual course of navigation. About 4 o'clock in the morning of the 17th, before daylight, the steamer Cambridge ran into and sunk her.

The libellants claimed complete indemnity for the loss sustained, about twelve hundred dollars. The district court was of the opinion that both vessels were in fault, and divided the damages equally. The evidence shows that the Omega had no signal light. If she had any light at all, it was a red light, displayed as if she were under sail. Nor had she any lookout that night. On the contrary both captain and mate seem to have been roused from their berths, either by the whistle of the Cambridge or by the actual collision, for both leaped on board the steamer, in that cold November evening, in shirt sleeves, and with their feet in stockings. And yet she was anchored where, though out of the most usual course of navigation, vessels passing up and down the river might very possibly come, and where her navigators were bound to use extraordinary care to guard against collision. But instead of extraordinary care, I am obliged to say, there was extraordinary negligence. Clearly the Omega was in fault; and if alone in fault ought to bear the whole loss, which the precautions required by law might have averted. But the evidence does not permit me to say that the Cambridge was free of blame. She seems to have been out of the regular course. Her compass was in bad order, and allowance was necessary for variation, and the pilot was probably mistaken as to precise allowance required. There was also a heavy fog that night,—so heavy that the white signal light of a vessel at anchor, required to be so bright as to be visible at a distance of at least a mile, could be seen from the steamer not farther than one hundred and fifty or two hundred yards. With such a compass, and in such a night, approaching a great port of commerce through a river in which many vessels were certain to be met or passed, peculiar obligations to prudence rested upon the officers of the Cambridge. I am satisfied that her lights were in proper trim and place, and that her officers were competent and vigilant; but I am not quite satisfied concerning her lookout, and not at all satisfied concerning her rate of speed. Her lookout was either among or behind some cattle on the forward deck, when he should have been at the stem, or so near as to have the best possible opportunity for seeing any object ahead. And there is some reason to doubt his fitness for the duty, though hardly enough to make his unfitness a good ground for decision against the steamer. What is more serious against the steamer is her speed. She was moving, some witnesses say, eight miles, and none say less than seven miles, an hour, under the circumstances already described. At this speed, and when the brightest light of a ship at anchor could not be seen more than four hundred and fifty or six hundred feet off, the risk of collision is necessarily imminent. In less than a minute from the time it could be seen, the steamer would strike any vessel immediately ahead, unless, being seen itself, the collision might be avoided by dexterous co-operation in the navigation of both vessels. This rate of speed, under the circumstances, cannot be sanctioned without disregard of well established principles essential to the security of property and life. If the Cambridge was not bound to stop during the density of the fog, she was, at all events, bound to proceed very slowly, taking every precaution against accident. Such would be fairly considered moderate speed, in the sense of the act of April 29, 1864.

By the best consideration I have been able to give to the case, my mind is brought to the same conclusion that was reached by my brother, the district judge, and the same decree, mutatis mutandis, will be entered here as was entered in the district court.